## Fitzpatrick's Guardian v. Baker et al.

(Decided February 5, 1929.)

T. E. MOORE, JR., J. A. SMITH and E. C. O'REAR for appellant.

JESSE MORGAN, F. J. EVERSOLE and W. C. EVERSOLE for appellees

OPINION OF THE COURT BY COMMISSIONER HOBSON—
Reversing.

Dr. J. F. Fitzpatrick died intestate August 17, 1927, a resident of Whitesburg, Ky. His wife, Eunice Fitzpatrick, died six days later. They left surviving four children, the oldest of whom was then 13 years old, and the youngest 7 or 8. Mrs. Fitzpatrick was a sister of William Baker, who lived at Hazard, Ky. She had a number of other relatives, who also lived in Perry county, where she had been reared. The Baker family all came to the burial. Dr. Fitzpatrick's mother lived with him.

She was 84 years old and very feeble. A sister, Mrs. Thompson, also lived at Whitesburg. In addition to the four children born to his wife, Dr. Fitzpatrick had a son, whom he had adopted, who was about 17 years of age. After Mrs. Fitzpatrick's burial, her family and Dr. Fitzpatrick's relatives had a consultation as to what would be done with the children. As a result of this consultation, the Bakers took the four children of Mrs. Fitzpatrick with them to Hazard, took care of them until the school opened on the first Monday in September, and then placed them in the Hazard Baptist Institute, a school maintained by the Baptist Church. On September 5th, F. G. Fairchild was duly appointed as administrator of the estate of Dr. Fitzpatrick and also as guardian of the children. He gave bond in the sum of $100,000. The estate was estimated to be worth from $75,000 to $100,-000. On September 10th, he demanded the children from William Baker and the Hazard Baptist Institute. The demand was refused. Then he took out a writ of habeas corpus for them. This was refused by the circuit judge on September 14th. Then he took out a rule in the Letcher county court against William Baker to show cause why he should not be fined for not obeying the order of that court as to the delivery of the children to the guardian. The rule was made absolute, and they were arrested for failing to obey the order of the court, but were discharged by the circuit judge on habeas corpus, on the ground that the county court acted without jurisdiction. Then, on October 20th, he brought this suit in equity, praying that the court adjudge the custody of the children to him. Proof was taken, and on final hearing the circuit court dismissed the petition. He appeals.

The witnesses differ as to what took place between the relatives after the burial of Mrs. Fitzpatrick, but Mrs. Thompson and her mother had no authority to control the custody of the children beyond the appointment of a guardian, and the court deems it immaterial to consider what agreement was then reached. Mrs. Baker had been educated in the Hazard Baptist Institute, and after her course was finished had taught there until her marriage. All her relatives lived in Perry county, and a number of Dr. Fitzpatrick's relatives also lived there. The Bakers, in taking the children home with them, evidently acted from the natural feeling to take care of their sister's little children. But their right to the custody of the chil-

dren after the appointment of the guardian is a different question.

Section 2032, Kentucky Statutes, provides:

"A guardian shall have the custody of his ward, and the possession, care and management of the ward's estate, real and personal, and out of the estate shall provide for the necessary and proper maintenance and education of the ward."

The rule applied under like statutes is thus stated in 28 C. J. pp. 1109, 1110, secs. 171, 172:

"A lawfully appointed general guardian or guardian of the person is entitled to custody of the ward, his right in this respect being superior to any rights of relatives, step-parents, or persons to whom the parents have in their lifetime, informally given the custody of the children; and even though the surviving parent has by will expressed a desire that a certain person have the care of the children, such person has no right to custody as against a lawfully appointed statutory guardian. Conversely, the ward is under the legal duty to remain with and submit himself to the control of the guardian, and this duty will be enforced by the courts unless the interests of the ward obviously require otherwise.

"The right of the guardian to custody of the ward is not an absolute one, but the matter of custody is subject to control by the court, which may deprive the guardian of such custody, or refuse to take the child from the custody of others and commit it to the custody of the guardian, the controlling consideration in the matter of custody, as in the matter of selecting the guardian, being the best interests of the child."

As illustrations of the rule that the controlling consideration is the best interest of the child, these are given in the notes: (1) Where the maternal grandparents had taken the child at the request of both parents, and were caring for her without expense, and the guardian was appointed only to gratify the father's spite against the grandparents; (2) where the mother was unfit to have the child's custody, and the defendant had taken the child from her and was caring for it properly, and the court was not satisfied of the guardian's good faith; (3)

where the defendants were the uncle and aunt of the ward, and able to provide for it, and willing to do so without charge, and the guardian was an unfit person to have custody of it. To the same effect, see 12 R. C. L. p. 1119, sec. 21.

There is here no imputation of any kind against the guardian. He is a man of character. He was for years president of the local bank, the partner and intimate friend of their father. He has reared a number of children, who are all now grown. The guardian of an infant occupies a very important relation towards him. He has the right to control and direct his education, and this may change the course of the infant's life; for as the twig is bent so often the tree is inclined. Strangers have no authority to interfere with the guardian, and take the custody of the children from him. On the other hand, he should not so act as to deny them the friendship of their relatives without good cause. So far as the court sees here, there is little ground to believe that there is any substantial reason for this controversy between the mother's relatives and the guardian, and the court sees no reason why they may not get together and agree upon things. The children's education should not be interrupted. The proof is uncontradicted that they are well cared for at the Hazard Baptist Institute and are doing well there. As the school year is now about half over, no change should be made until the end of the school year. At the end of the school year the custody of the children should be surrendered to the guardian, and he should make such arrangements for them as in his judgment are for their best interest. The domicile of the children is the domicile of their father. Their maternal relatives are without power to change their domicile. The domicile of the children being in Whitesburg, all controversy between the guardian and maternal relatives is a matter that should be adjudicated by the courts of their domicile, and if the guardian is not in any respect acting for the best interests of the children the matter may be presented to the courts there.

Shelton v. Hensley, 221 Ky. 808, 299 S. W. 979, was unlike this case. There the child was with the stepmother, with whom the death of her father had left her. She had, so far as appears, no estate, and there was simply a controversy between her mother's relatives and her stepmother as to who should have charge of her. No claim against the guardian was asserted by the step-

mother, and bad feeling between the families was all that had given rise to the controversy. The opinion rests on the facts of that case. The child was only 8 years old. Her father's father and mother, with whom his widow lived, had by some sort of proceedings adopted the little girl. Her mother's father and mother, from pure ill feeling and for no other cause, were trying to take the child from them.

The guardian should pay all the reasonable and necessary expenses of the children at the Hazard Baptist Institute, and also all reasonable and necessary expenses for clothing bought for them and the like, for the infants may not suffer, and their estate is liable for necessaries furnished them; but, as the Bakers took the children to their home and kept them against the consent of the guardian, they cannot make against the guardian any charge for the board of the children at their homes. William Baker has no right to set off what he has expended for the children against what he owes the estate of Dr. Fitzpatrick; the guardian should pay William Baker any necessary expenses, as above stated, which he has incurred for the children. There is no reason why, under the evidence, there should be any litigation over these matters.

Judgment reversed, and cause remanded for a judgment, and for further proceedings consistent herewith.